UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
                                  :

ASHLEY AUTUMN KOVALCHIK,        :

                       Plaintiff,     :

                -v-                :

                                    :

THE CITY OF NEW YORK and TONY    :
SIMMONS, individually and in his official  :
capacity,                            :

                     Defendants.  :

---------------------------------------------------------X

> USDC-SDNY
> DOCUMENT
> **ELECTRONICALLY FILED**
> DOC #:_____
> DATE FILED: 9/18/14

No. 09-cv-4546 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

     Plaintiff was a resident at a New York City youth detention facility. She alleges that

Defendant Tony Simmons, an employee of New York City's Department of Juvenile Justice

("DJJ"), raped her in an elevator at the Manhattan Family Courthouse while transporting her

from the youth holding area to the courtroom.

     Before the Court are the cross motions of Plaintiff and Defendant City of New York (the

"City") for summary judgment. Because the Court concludes that Plaintiff has failed to

demonstrate a basis for holding the City liable under either federal or state law, the City's motion

is granted, and Plaintiff's motion for summary judgment against the City is denied. Plaintiff's

motion for summary judgment against Simmons is also denied, because there is a genuine issue

of material fact as to whether the alleged sexual assault occurred. Simmons has not appeared in

this action, however, and a default judgment may thus be appropriate. Accordingly, if Plaintiff

wishes to pursue judgment against Simmons, within thirty days of this Order she should prepare

a default judgment submission in accordance with this Court's Individual Rules and Practices.

## BACKGROUND[1]

*The Alleged Rape:* In September 2005, Plaintiff was a "non-secured" resident of the 145th Street Youth Facility in New York City. (Pl.'s 56.1 ¶ 4.) On September 12, 2005, she was ordered to appear at Manhattan Family Court. (Id. ¶ 5.) That day, Defendant Simmons—who, by that time, had been employed by DJJ for about thirteen years (id. ¶ 1)—and a female counselor picked up Plaintiff, transported her to the courthouse, and took her to the "girls['] holding room." (Id. ¶ 6.) There, she waited "with other girls and a female juvenile counselor" for her hearing. (Id. ¶ 7.)

Plaintiff asserts that Simmons transported her, alone, from the holding area to the courtroom. (Id. ¶ 10.) At her deposition, she testified that after she entered the elevator with Simmons, he used his elevator key to send the elevator down to the basement instead of to the courtroom. (Declaration of David Pollack, Sept. 13, 2013 ("Pollack Decl."), Ex. E at 37-38.) Once the elevator stopped, she alleges, Simmons "pushed himself behind" her and raped her. (Id. at 38; Pl.'s 56.1 ¶ 8.) He then brought Plaintiff to the courtroom. (Pl.'s 56.1 ¶ 8.) Plaintiff was fifteen years old at the time. (Id. ¶ 7.)

Simmons testified at his deposition that he did not transport Plaintiff from the holding area to the courtroom that day, or otherwise accompany her to the courtroom in an elevator. (Pollack Decl. Ex. B at 48.) The female counselor present in the holding area that day, Patricia Jerry, testified at Simmons's criminal trial. (Pollack Decl. Ex. H.) Although Jerry did not specifically recall the day of the alleged rape, she testified—after reviewing the "logbook" from that day—that it would have been "normal procedure" for either her or her supervisor to

---

[1]     The following facts are undisputed unless otherwise noted. Citations to "Pl.'s 56.1" refer to Plaintiff's Statement of Uncontested Facts Pursuant to Local Rule 56.1. Because Plaintiff's statement of facts parallels the City's, no citations to the City's statement are necessary.

transport the female detainees to the courtroom, and that she had no recollection or record of Simmons transporting Plaintiff. (Id. at 370.)

The parties agree that when Plaintiff arrived at the hearing that day, she did not tell her mother or her attorney about the rape, and did not tell any official about it until 2008, when Simmons was being investigated for other allegations of sexual abuse. (Pl.'s 56.1 ¶ 11; Pollack Decl. Ex. E at 40.) Simmons was eventually criminally prosecuted for the abuse and went to trial. (Pl.'s 56.1 ¶¶ 14-15.) Although he was acquitted of raping Plaintiff, Simmons was convicted of sexually assaulting two other juveniles under his care, and was sentenced to a term of incarceration.[2]  (Id. ¶ 16.)

*DJJ Policies*:  The parties also agree that at the time of the alleged incident, DJJ had policies expressly prohibiting sexual harassment of supervisees, precluding employees from having contact with supervisees unless necessary to carry out official business, and requiring counselors to report any child abuse. (Id. ¶¶ 2-3, 19.) DJJ policies further required at least one counselor of the same gender to be present when transporting residents from residential facilities "to clinic appointments, funerals or other approved field activities." (Pollack Decl. Ex. K at 210; see also Pl.'s 56.1 ¶ 20.) The record does not contain any evidence regarding a policy specifically addressing how residents should be transported to court or supervised while awaiting court appearances.

*Procedural History*:  In her Complaint in this case, Plaintiff raises a § 1983 claim against Simmons and asserts municipal liability against the City under a "deliberate indifference" theory. (Compl. ¶¶ 30-48.) She also asserts state law claims for assault and battery against Simmons (id. ¶¶ 57-63); claims for negligence, negligent supervision, and "negligent hiring/training/retention"

---

[2]      The record does not provide any information about Simmons's sentence, although a newspaper article submitted by the City states that he faced a maximum term of four years. (Pollack Decl. Ex. L at 2.)

against the City (id. ¶¶ 70-86); and a claim for intentional inflection of emotional distress against both Simmons and the City (id. ¶¶ 64-69).

The City answered the Complaint and, after almost four years of discovery and stays related to the criminal proceeding, filed the instant motion for summary judgment. According to the docket, Simmons was served with the Complaint and Summons on May 28, 2009. (ECF no. 6.) Although he was deposed on at least two occasions from prison as part of this litigation (Pollack Ex. B at 1; Decl. of Arkady Frekhtman, Oct. 14, 2013 ("Frekhtman Decl.") Ex. C at 1), Simmons has not responded to the Complaint or otherwise appeared in this action, and Corporation Counsel has made clear that it does not represent him (see Def.'s Mem. of Law at 1 n.1).

## DISCUSSION

On a motion for summary judgment, the Court must "constru[e] the evidence in the light most favorable to the non-moving party and draw[ ]all reasonable inferences in its favor." In re Publ'n Paper Antitrust Litig., 690 F.3d 51, 61 (2d Cir. 2012). Where, as here, the parties have cross-moved for summary judgment, the Court analyzes each motion separately, "in each case construing the evidence in the light most favorable to the non-moving party." Novella v. Westchester Cnty., 661 F.3d 128, 139 (2d Cir. 2011).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The Court first considers Plaintiff's § 1983 claims against the City, then addresses her supplemental state law claims against the City, and finally turns to her claims against Simmons.

## A.     Section 1983 Claims Against the City of New York

Count Two of the Complaint asserts a claim for "Municipal Liability" against the City of New York, and Count Three asserts a claim for "Deliberate Indifference to Plaintiff's Constitutional Rights Under 42 U.S.C. § 1983."[3]  The City is entitled to summary judgment on both claims.

### 1.     Bases for Municipal Liability

A municipality may be liable under § 1983, the relevant portion of which is excerpted in the margin,[4] if the government body "itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011).  Municipalities, however, "are responsible only for their *own* illegal acts"; they cannot be held "vicariously liable under § 1983 for their employees' actions." Id.  "In short, to establish municipal liability under § 1983, a plaintiff must prove that action pursuant to official municipal policy caused the alleged constitutional injury." Cash v. Cnty. of Erie, 654 F.3d 324, 333 (2d Cir. 2011).

Official municipal policy "includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Connick, 131 S. Ct. at 1359.  Additionally, a city's "policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a

---

[3]     The Complaint does not contain a Count One.  For consistency, the Court uses the numbering in the Complaint.

[4]     "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983.

decision by the city itself to violate the Constitution." Id. at 1360. Consistent with this principle, "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." Cash, 654 F.3d at 334.

In this case, Plaintiff has not identified any formal policy officially endorsed by the City that caused her injury. Nor has she attempted to show that Simmons had policymaking authority such that the City was liable for his acts, or that there existed a "persistent and widespread" practice within DJJ "as to practically have the force of law." Connick, 131 S. Ct. at 1359. Rather, her assertion of municipal liability is premised on a "deliberate indifference" theory: the City maintained a "policy of inaction" despite notice that such inaction would cause constitutional violations. Id.

The Supreme Court has explained that "[d]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Id. at 1360. To prevail under this theory, the plaintiff must establish "that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was obvious, and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 128 (2d Cir. 2004) (Sotomayor, J.). In other words, the "operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a conscious choice rather than mere negligence." Id.

The Second Circuit recently applied these principles in a case that addressed similar facts

6

to those presented here: whether a municipality could be held liable for injuries resulting from a male sheriff deputy's sexual assault of a female pretrial detainee. Cash v. Cnty. of Erie, 654 F.3d 324, 333 (2d Cir. 2011). In Cash, the plaintiff prevailed at trial, but the district court awarded the municipality judgment notwithstanding the jury verdict. Id. at 332. The Circuit reversed and reinstated the verdict.

The Court began by noting that "the pattern ordinarily necessary to prove deliberate indifference in the context of a failure-to-train claim" did not "neatly transfer" to allegations of sexual assault by a prison guard. Id. at 336. Because New York did not afford prison guards any discretion concerning sexual contact with prisoners, plaintiff was not asserting that additional training was necessary to help guards distinguish permissible from impermissible sexual contact, or that additional supervision would have helped guards discern whether such contact was proper. Rather, Judge Raggi explained, the deliberate indifference inquiry turned on "the adequacy of defendants' own actions to prevent sexual contact between guards and prisoners consistent with their affirmative duty to protect prisoners in their custody." Id.

In the Circuit's view, a jury could have found that "mere proscriptions on sexual contact between guards and prisoners had proved an insufficient deterrent to sexual contact." Id. Central to this conclusion was evidence that prior to the sexual assault at issue, another detainee complained of sexual misconduct by prison guards. At best, the Circuit explained, this complaint indicated "that a female prisoner repeatedly had engaged in sexual exhibitionism before various guards, none of whom had reported" it; at worst, the prior inmate complaint "indicated that male guards had engaged a female prisoner in a variety of more intimate sexual activities." Id. Citing these allegations, the Circuit concluded that a jury could have found that the municipality should have taken more proactive steps to prevent abuse, such as "by

prohibiting unmonitored one-on-one interactions between guards and prisoners." Id. at 339.

  Cash is instructive in that it demonstrates what a plaintiff must prove to show deliberate indifference in the context of the sexual assault of a detainee or prisoner. As described in the following section, Plaintiff's proof falls far short of the proof adduced in Cash, and the case is distinguishable in several important ways.

  **2. Sufficiency of Plaintiff's Evidence**

  Plaintiff's brief is not a model of clarity and is less than precise in articulating its theory of deliberate indifference.

  At times, Plaintiff appears to offer a Cash-like theory, asserting that DJJ should have provided more specific and restrictive guidance concerning the transportation of juvenile residents under its supervision—for example, by specifically precluding unmonitored one-on-one interactions. (See, e.g., Pl.'s Mem. of Law at 11-12 (remarking that "the question presented by this case" is whether DJJ's prohibitions on sexual contact were sufficient, or whether more was "required to discharge [its] protective duty, specifically, precluding or at least monitoring one-on-one contact between guards and prisoners").) At other times, Plaintiff seems to acknowledge that DJJ did preclude unmonitored one-on-one contact, at least between male supervisors and female detainees. (See, e.g., Pl.'s Mem. of Law at 16-17 ("In Chapter 3 of Policy #3.3 . . . DJJ clearly recognizes the need for same sex supervision and when that is not possible, **it states at least one female and one male to supervise** [sic] **females**." (emphasis in original).) As the Court understands this argument, DJJ—recognizing the dangers posed by unmonitored interactions between counselors and juveniles of different genders—has enacted policies to prevent such opposite-gender supervision, but simply failed to ensure that Simmons complied with those policies.

Plaintiff's first theory assumes that DJJ did not have a policy precluding male counselors like Simmons from transporting female detainees like Plaintiff unaccompanied. The limited evidence available on this issue, however, suggests otherwise. In particular, Plaintiff asserts as an undisputed fact—and the City agrees—that "DJJ issued to all staff on January 2, 2001, a new policy effective January 15, 2001 requiring at least one male and one female staff member when transporting male and female residents." (Pl.'s 56.1 ¶ 20.) Indeed, the DJJ employee who supervised the female detainees on the day of the alleged rape, Patricia Jerry, testified that it was the "normal procedure" for the female juvenile counselor to escort the females to the courtroom absent contrary instructions from her supervisor. (Pollack Decl. Ex. H at 370 ("That was the normal procedure. I was the female juvenile counselor there and I would take all the females to court unless directed by my supervisor.").)[5] Plaintiff's deposition testimony is consistent with this evidence; she explained that "typically" either her attorney "or one of the female workers" transported her from the holding area to the courtroom. (Pollack Decl. Ex. E at 36.)

Even assuming, however, that DJJ did not have a policy prohibiting males from escorting females to court unaccompanied, merely pointing to a potential shortcoming in agency policy would not be enough to survive summary judgment. Plaintiff must also offer admissible evidence from which a jury could conclude that the City or DJJ policymakers "had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was obvious." Amnesty Am., 361 F.3d at 128. In Cash, the plaintiff met her

---

[5]   Jerry's testimony from the criminal trial is properly before the Court on the instant summary judgment motions. See U.S. S.E.C. v. Amerindo Inv. Advisors, Inc., 05 CIV. 5231(RJS), 2013 WL 1385013, at *5 (S.D.N.Y. Mar. 11, 2013) ("[S]worn testimony from another trial is admissible on a motion for summary judgment."); U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co., 98 CIV. 8168(MBM), 2001 WL 521809, at *2 & n.1 (S.D.N.Y. May 16, 2001) (relying on trial testimony from a separate proceeding and noting that the Court could do so even though the defendant was not a party to the prior proceeding).

burden by introducing evidence that, prior to the rape of plaintiff, an inmate had submitted a complaint alleging that she had engaged in various sexual acts with prison guards, and that investigators had "thought it likely that such prohibited sexual activity had in fact occurred." Cash v. Cnty. of Erie, 654 F.3d 324, 336 (2d Cir. 2011).

Here, although Plaintiff appears to assert two distinct arguments—that the City did not have adequate policies in place, and that it failed to supervise Simmons's compliance with existing policies—the evidence she offers to show that the City had notice of a potential problem, "such that the need for corrective action or supervision was obvious," is the same for both arguments.

Namely, Plaintiff relies almost entirely on a two-page memorandum from an investigator in the District Attorney's Office for the County of New York, which describes an August 2008 interview with an individual whose name is redacted. (Frekhtman Decl. Ex. A at 1-2.) The combination of the redactions throughout the document and the investigator's shorthand make parts of the memorandum difficult to follow. The memorandum, however, appears to indicate that the individual was housed in a juvenile detention facility; that Simmons would flirt with her and "touch her butt" when he transported her from her residential facility to court; that on one occasion—when the individual was twelve or thirteen years old—Simmons "told her to come to the bathroom," which she did, and the two had sexual intercourse there; and that, in approximately 2001, the witness told "a detective," the director of her residential facility, a doctor, and potentially a therapist about what happened. (Id. at 1-2.)[6]

---

[6]      The relevant portion of the interview memorandum states:

> [Redacted] got into an argument and she went and told the staff that she saw Tyson [i.e., Simmons] touch her. She denied it. The female staff was like are you sure, a cover up, she responded no. When the doctor asked her she told her what happened. There was no rape, it was consensual. Back then she told them he raped her. She didn't want to look like a bad girl.

The problem with Plaintiff's approach, however, is that the statements in the document on which she seeks to rely are hearsay.[7]

If Plaintiff had, for example, identified the individual and submitted an affidavit, a declaration, or deposition testimony, such evidence may well have raised a factual dispute as to whether the City "had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was obvious." Amnesty Am., 361 F.3d at 128. Notwithstanding several years of discovery, she has failed to do so.

The law is clear that "[o]n a motion for summary judgment the Court's consideration is limited to factual material that would be admissible in evidence at the trial." Local Unions 20 v. United Bhd. of Carpenters & Joiners of Am., 223 F. Supp. 2d 491, 496 (S.D.N.Y. 2002); see CILP Associates, L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013) (noting that, when the movant points to a lack of evidence on an element on which the nonmovant would bear the burden of proof at trial, "the nonmoving party must come forward

---

While she was Upstate she spoke to Inez Evans, the Director. She saw a detective, who said are you sure about the rape, and she was confused and said he didn't rape me. She had sex with him, she consented. She doesn't remember speaking to the D.A.

She told her therapist, [redacted]. She is bi-polar and ADHD. She was about 13 years old when she told them. She got sentenced at 13 years old.

(Frekhtman Decl. Ex. A at 2.)

[7]      The Court notes that a party may waive its objection to the admissibility of a document at the summary judgment stage by failing to object. See, e.g., Capobianco v. City of New York, 422 F.3d 47, 55-56 (2d Cir. 2005) (concluding that the district court erred by *sua sponte* excluding a document as inadmissible hearsay, where both parties had relied on the document in their summary judgment briefing and neither had challenged its admissibility). Although the City refers to the witness's statements in this document as an "unsubstantiated allegation" (Reply Br. at 4 n.2), the City's reply brief does not argue specifically that the statements are inadmissible. Nonetheless, the Court deems it appropriate to consider this objection. Unlike the Capobianco case, in which both parties relied on the document the district court *sua sponte* found inadmissible, here the City has consistently challenged the relevance and weight of the interview memorandum. Moreover, Plaintiff has given no indication it could put these statements into admissible form. See Moore's Federal Practice § 56.91[3] (describing the difference between "inadmissible content" and "inadmissible form"). Insofar as "the purpose of summary judgment is to prevent trials that are unnecessary because of an absence of material issues of fact for the jury to decide," Pahuta v. Massey-Ferguson, Inc., 170 F.3d 125, 130 (2d Cir. 1999), it would seem inappropriate to permit the case to proceed where the only evidence supporting Plaintiff's theory is plainly inadmissible.

with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment"); Int'l Gateway Exch., LLC v. Western Union Fin. Servs., Inc., 333 F. Supp. 2d 131, 141 (S.D.N.Y. 2004) ("[T]he evidence supporting the position of the non-moving party also must be admissible at trial.").

Without more, the existence of the memorandum could be used to show that the City was on notice of Simmons's conduct as of 2008, when the investigators wrote the document. See, e.g., Williams v. City of New York, 2012 WL 511533, *3 n.2 (E.D.N.Y. Feb. 15, 2012) ("While summary judgment may only be granted on the basis of admissible evidence, the witness statements recorded in the police reports are not inadmissible hearsay because they are not offered for the truth of the matter asserted, *i.e.,* that Williams was the shooter, but for purposes of establishing whether the police had information establishing probable cause."). But because Plaintiff has not shown a basis for the admission of the individual's statements, they cannot be used to establish that Simmons had sexual contact with the witness, or—more importantly for purposes of Monell liability—that the witness in fact disclosed Simmons's behavior to a City official. See, e.g., United States v. Brown, 95 CR. 168 (AGS), 1995 WL 387698, at *10 (S.D.N.Y. June 30, 1995) ("[M]emoranda of interviews conducted by either the NYPD or the Bronx District Attorney's Office . . . would, of course, be hearsay, and inadmissible as evidence at trial."); Morris v. Eversley, 00 CIV. 8166DC, 2004 WL 856301, at *2 (S.D.N.Y. Apr. 20, 2004) (Chin, *J.*) ("To the extent the proposed evidence is offered to prove the truth of the assertions therein—that Eversley engaged in the alleged sexual conduct—it is hearsay. For example, the August 9, 1999, memorandum of the interview of inmate Gray is pure hearsay, as it records Gray's statements as to what she saw."). Absent admissible evidence that the City was on notice of potential shortcomings in its policy as of September 2005, or had been notified of

inappropriate behavior by Simmons or other DJJ employees, Plaintiff cannot show that City

officials were deliberately indifferent to the potential for constitutional violations.[8]

Additionally, Plaintiff offers an "expert" affidavit of Joyce Burrell, which asserts that the

City is liable because it "failed to properly supervise" Simmons. (Frekhtman Decl. Ex. B ¶ 14.)

Although Burrell identifies herself as an "expert witness retained by the plaintiff," (id. ¶ 2),

neither she nor Plaintiff provides any information about her qualifications or attempts to identify

the subject in which she is an expert. See, e.g., Bazile v. City of New York, 215 F. Supp. 2d

354, 395 (S.D.N.Y. 2002) (concluding, on a motion for summary judgment, that plaintiff's

proffered expert was not qualified under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S.

579 (1993), and thus disregarding the witness's opinions). Even assuming that Burrell were

properly qualified as an expert, her affidavit provides only legal conclusions. See, e.g.,

Frekhtman Decl. Ex. B ¶ 3 ("Defendants . . . were jointly and severally negligent, careless and

reckless, in failing to enforce promulgated policies, rules, regulations, directives, guidelines

and/or orders which directly violated Plaintiff, ASHLEY KOVALCHICK's, city, state and

federal constitutional rights . . . ."); id. ¶ 6 ("It is my professional opinion that 'DJJ' did jointly

and severally failed [sic] to adequately and properly enforce, for the protection of the Plaintiff,

its promulgated mission statement, values and commitments it owed to Plaintiff . . . ."). None of

these opinions would "help" the trier of fact within the meaning of Federal Rule of Evidence

702(a). See, e.g., Andrews v. Metro N. Commuter R. Co., 882 F.2d 705, 709 (2d Cir. 1989)

(concluding that district court erred by permitting expert to testify that railroad company was

---

[8]     Plaintiff also submits a memorandum of an interview of one of Simmons's former co-workers. (Frekhtman
Decl. Ex. A at 3-4.) This individual purportedly told the investigator, also in 2008, that Simmons's partner had been
arrested because "[t]hey ran a brothel out of the juvenile detention center" in 2000 and that although "[s]he never
heard rumors prior to 2008 about Simmons with young girls[,] [t]hese rumors are now facility wide." (Id.) This
interview memorandum is also inadmissible hearsay.

negligent); 4 Weinstein's Federal Evidence § 702.03[3] (noting that courts generally exclude expert evidence relating to the negligence of one of the parties or their state of mind). The Burrell affidavit is therefore insufficient to create an issue of material fact.

At a broader level, although the Court is sympathetic to Plaintiff's argument that the DJJ "failed to properly supervise its employee" (Pl.'s Mem. of Law at 15), in virtually every instance in which a municipal employee commits a tort it could be said that "additional supervision" may have prevented the act. The law, however, requires plaintiffs to meet a "stringent standard" before they may hold a municipality liable under a theory that municipal inaction caused plaintiff's injury. Connick, 131 S. Ct. at 1360. Plaintiffs must show that "the need for more or better supervision to protect against constitutional violations was obvious" and that the municipality or those with policymaking authority "made no meaningful attempt to forestall or prevent the unconstitutional conduct." Amnesty Am., 361 F.3d at 127. Here, Plaintiff has not adduced admissible evidence sufficient to satisfy either requirement.

Given the seriousness of Plaintiff's allegations, the Court has reviewed the record with great care. If proven true, these deeply disturbing allegations about what happened in September 2005 would surely entitle Plaintiff to damages from Simmons. The Supreme Court, however, has explained that plaintiffs seeking to recover from a municipality based on the constitutional torts of its employees must meet the "strict" standard described above, because a lesser standard "would result in *de facto respondeat superior* liability on municipalities." Connick, 131 S. Ct. at 1360. Here, based on the record presently before the Court, Plaintiff simply could not show at trial that the need for corrective action was "obvious" to officials within the DJJ, as is required to support such a claim. Because "the purpose of summary judgment is to prevent trials that are unnecessary because of an absence of material issues of fact for the jury to decide," Pahuta v.

14

Massey-Ferguson, Inc., 170 F.3d 125, 130 (2d Cir. 1999), the City is entitled to summary judgment on Plaintiff's § 1983 claims.

**B.      Plaintiff's State Law Claims**

Plaintiff asserts four state law claims against the City: negligence, negligent supervision, "negligent hiring/training/retention," and intentional infliction of emotional distress.[9]  The City is entitled to summary judgment on each of these claims.

*Negligence Claims:*  In order to prevail on a claim of negligence under New York law, a plaintiff must prove three familiar elements: (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.  See, e.g., Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P., 737 F.3d 166, 177 (2d Cir. 2013).  "To state a claim for negligent supervision or retention under New York law, in addition to the standard elements of negligence, a plaintiff must show: (1) that the tort-feasor and the defendant were in an employee-employer relationship, (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence, and (3) that the tort was committed on the employer's premises or with the employer's chattels." Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004).

---

[9]      The City asserts that if the Court grants it summary judgment on Plaintiff's § 1983 municipal liability claim, the Court should decline to exercise supplemental jurisdiction over Plaintiff's common law claims against the City.  The Court would likely agree—if the City were the only Defendant named in the action.  See, e.g., Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.").  The City's position, however, ignores Plaintiff's pending claims—under both federal and state law—against Simmons.  The Court cannot decline to exercise supplemental jurisdiction when Plaintiff has pending federal-law claims, unless one of the other factors described in 42 U.S.C. § 1367(c) is present, which is not the case.  See 13D Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 3567.3 at n.85.  Indeed, even if the Court were to enter a default judgment against Simmons on Plaintiff's remaining claims against him, it would nonetheless be inappropriate to decline to exercise supplemental jurisdiction over the pending state-law claims against the City.  See Morin v. Empiyah & Co., LLC, 389 F. Supp. 2d 506, 511 (S.D.N.Y. 2005) (Chin, *J.*).

Here, Plaintiff's negligent supervision and negligent hiring/retention claims can be addressed briefly. As discussed in the preceding section, Plaintiff has not offered any admissible evidence suggesting that the City or DJJ "knew or should have known" of Simmons's "propensity" to engage in the type of behavior at issue in this case. Indeed, the limited evidence available on this issue suggests the opposite: the City suspended Simmons in July 2008, which is at or about when the District Attorney's investigation into his conduct began. (Pl.'s 56.1 at ¶ 17.) No admissible evidence suggests that the City was aware of any inappropriate behavior by Simmons before that time. Accordingly, the City is entitled to summary judgment on Plaintiff's claims for negligent supervision and "negligent hiring/training/retention," which are denominated in the Complaint as state law counts five and six. See Ronessa H. v. City of New York, 957 N.Y.S.2d 188, 191 (2d Dep't 2012) (directing judgment as a matter of law where no evidence showed that the City was aware of a police officer's inclination to engage in sexual assault).

With respect to Plaintiff's negligence claim, the Complaint alleges that the City "failed to develop, implement and/or enforce appropriate rules, regulations and/or guidelines to protect and safeguard the female juvenile detainees under its custody and control" and "failed to adequately supervise, monitor and protect" the detainees. (Compl. ¶¶ 73-74.)

The Court notes at the outset that although this direct negligence claim raises many of the same issues as Plaintiff's "deliberate indifference" § 1983 claim, the standard for showing direct negligence is less rigorous. See, e.g., Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 128 (2d Cir. 2004) (explaining that the "operative inquiry" in a § 1983 claim "is whether the facts suggest that the policymaker's inaction was the result of a conscious choice rather than mere negligence" (quotation marks omitted)). Notwithstanding this lower standard, the Court

16

concludes that the City is entitled to summary judgment on Plaintiff's negligence claim.

The Court recognizes that Plaintiff has demonstrated the first element, that the City owed her a duty of care. See State, Office of Children & Family Servs. v. Civil Serv. Employees Ass'n, Inc., 913 N.Y.S.2d 796, 799 (2010) (noting that individuals supervising juvenile detention facilities had a duty to keep their supervisees "safe from harm and to refrain from inflicting any harm upon them"); see also Gordon v. City of New York, 70 N.Y.2d 839, 840 (1987) ("[A] duty of care is owed by prison authorities with respect to the health and safety of their charges.").

As for the second element—breach of that duty—aside from Plaintiff's general assertions that DJJ's "policies" were not "sufficient or adequate" (e.g., Pl.'s Mem. of Law at 17), she provides few details about precisely what aspect of these policies was deficient. The parties agree that in 2001, DJJ issued a policy "requiring at least one male and one female staff member when transporting male and female residents." (Pl.'s 56.1 ¶ 20.) Simmons's female co-worker on the day of the alleged rape testified that it was the "normal procedure" for the female juvenile counselor to escort the females to the courtroom absent contrary instructions from a supervisor, and that she had no record or recollection of Simmons transporting Plaintiff in the elevator. (Pollack Decl. Ex. H at 370.) Plaintiff has not offered any admissible evidence suggesting that the City was aware of prior misconduct by Simmons or by any other DJJ counselor. Without this evidence, no jury could find that reasonable care required the City to adjust its policies or provide greater supervision of Simmons. The City is therefore entitled to summary judgment on Plaintiff's direct negligence claim.

***Intentional Infliction of Emotional Distress (IIED):*** Plaintiff seeks to hold the City vicariously liable for IIED under the doctrine of *respondeat superior*, which permits a plaintiff to hold a tortfeasor's employer liable for the tortfeasor's acts "only if those acts were committed in

furtherance of the employer's business and within the scope of employment." N.X. v. Cabrini Med. Ctr., 97 N.Y.2d 247, 251 (2002).  (See Compl. ¶¶ 66-67 (The aforementioned conduct was committed by defendant TONY SIMMONS while acting within the scope of [his] employment by defendant" and "while acting in furtherance of [his] employment").

The New York Court of Appeals has repeatedly held, however, that sexual assaults are "a clear departure from the scope of employment" and are "committed for wholly personal motives." Cabrini, 97 N.Y.2d at 251; see Judith M. v. Sisters of Charity Hosp., 93 N.Y.2d 932, 933 (1999) ("[I]t is clear that the employee here departed from his duties for solely personal motives unrelated to the furtherance of the Hospital's business."); see also Adorno v. Corr. Servs. Corp., 312 F. Supp. 2d 505, 517 (S.D.N.Y. 2004) ("New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context."). Although Cabrini and Judith M. involved sexual assaults by a physician and hospital orderly, the reasoning applies equally here.  Simmons's alleged sexual assaults were neither committed in furtherance of DJJ's business nor were they within the scope of Simmons's employment.  The City is therefore entitled to summary judgment on Plaintiff's IIED claim.

## C.    Claims Against Simmons

Plaintiff also moves for summary judgment against Simmons.  The docket reflects that Simmons was served with the Summons and Complaint on May 28, 2009, when Plaintiff's process server left the documents with an individual authorized to accept service at DJJ. (Dkt no. 6.)  Plaintiff has not responded to the Complaint or otherwise appeared in this matter.  He has been deposed in prison at least twice, however; on one occasion he answered the questions posed by Corporation Counsel (see Pollack Decl. Ex. B), and on another he refused to answer any

questions, invoking his Fifth Amendment right to freedom from self-incrimination based on the advice of his attorneys from Legal Aid (see Frekhtman Decl. Ex. C), who represent him in his criminal appeal. The docket does not indicate whether Plaintiff served Simmons with notice of its motion for summary judgment against him.

Typically, when presented with this scenario, plaintiffs move for summary judgment against the answering defendant and seek a default judgment against any defendants who have not responded to the complaint. See, e.g., Williams v. Cohen, 101 F. App'x 862, 863 (2d Cir. 2004); Nat'l Credit Union Admin. Bd. v. Madar, 93 CV 3997, 1998 WL 386486, at *1 (E.D.N.Y. July 9, 1998). Here, however, Plaintiff has simply moved for summary judgment against Simmons without making a default judgment submission.

Presented with this procedural posture, the Court could proceed in one of several ways: assess the record before it to determine whether a triable issue exists as to Simmons, notwithstanding his failure to oppose the summary judgment motion; deny or withhold consideration of Plaintiff's motion against Simmons and order her instead to move for a default judgment; or construe Simmons's failure to appear or oppose the motion as admission of the allegations against him.

The parties have not brought to the Court's attention a case that addressed this scenario, nor has the Court been able to locate one. Recently, however, the Second Circuit explained that when a party "fails to respond to an opponent's motion for summary judgment, a district court may not enter a default judgment. Rather, it must examine the movant's statement of undisputed facts and the proferred record support and determine whether the movant is entitled to summary judgment." Jackson v. Federal Express, 12-1475-CV, 2014 WL 4412333, at *6 (2d Cir. Sept. 9, 2014). Although Jackson did not address precisely the scenario at issue here—the litigant in that

case appeared and failed to oppose only certain portions of the defendant's summary judgment motion—the Circuit in that case expressed a clear preference for ensuring that grants of summary judgment, in the face of one party's non-opposition, find support in the record. See, e.g., id. at *3 n.2 ("[M]any default rules such as Rule 55, Rule 4(a), Rule 16(f), and Rule 37(b)(2) are based on the ancient common law axiom that a default is an admission of all well-pleaded allegations against the defaulting party, while motions for summary judgment lack these ancient common law roots." (alterations omitted)).

Applying those principles to this case, the Court concludes that it is appropriate to review the record to determine whether Plaintiff is entitled to summary judgment on her claims against Simmons. After such a review, the Court concludes that Plaintiff is not entitled to summary judgment against Simmons. Even assuming that she is entitled to an adverse inference against him because he invoked the Fifth Amendment during his second deposition in this matter (see Frekhtman Decl. Ex. C), other evidence creates a disputed issue of fact regarding whether Simmons raped Plaintiff on the day in question. Specifically, at his first deposition, Simmons testified that on the day in question he did not transport Plaintiff in the elevator to the courtroom and did not rape her (Pollack Decl. Ex. B at 48); his coworker testified, after reviewing the "logbook" from the day, that either she or her supervisor would have accompanied Plaintiff to court that day, and that she had no recollection of Simmons ever transporting a detainee to court (id. Ex. H at 370-71); and Plaintiff admits that she "told no official about her alleged encounter with Simmons for a three year period following 2005, until she was contacted by the District Attorney's Office in 2008 and was told other juvenile residents were making allegations" (Pl.'s 56.1 ¶ 11). Viewed in the light most favorable to Simmons, a juror could conclude based on this evidence that he did not rape Plaintiff. Plaintiff's motion for summary judgment against

Simmons is therefore denied.

It is well-established, of course, "that a defendant who defaults thereby admits all 'well-pleaded' factual allegations contained in the complaint." City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 137 (2d Cir. 2011). Consistent with this principle, Plaintiff will be entitled to judgment against Simmons in the event that he does not appear in this action.

Accordingly, if Plaintiff seeks a judgment against Simmons, she should prepare a submission consistent with Appendix A of this Court's Individual Rules and Practices in Civil Cases within thirty days of this Order. The Court is mailing a copy of this Order to Simmons at the Clinton Correctional Facility where, according to the New York State Department of Corrections website, he appears to be serving his sentence.[10]

## CONCLUSION

The City of New York's motion for summary judgment is GRANTED, and Plaintiff's motions for summary judgment against the City of New York and Defendant Simmons are DENIED.

If Plaintiff wishes to move for a default judgment against Simmons, she shall submit the appropriate materials within thirty days of this Order. In the event she does not do so, her remaining claims may be dismissed for failure to prosecute. See Fed. R. Civ. P. 41(b).

The Clerk of Court is respectfully requested to close the motions pending at docket numbers 48 and 55.

SO ORDERED.

Dated:     September 18, 2014
           New York, New York

                                          Ronnie Abrams
                                          United States District Judge

---

[10]     See http://nysdoccslookup.doccs.ny.gov/, inmate number 11A0596. The address of the Clinton Correctional Facility is 1156 Rt. 374, P.O. Box 2001, Dannemora, New York, 12929.